## INTERNATIONAL LIFE INS. CO. v. MOELLER.

Circuit Court of Appeals, Seventh Circuit.
June 20, 1929.

No. 4108.

F. B. Shoaff and W. J. Vesey, both of Ft. Wayne, Ind., for appellant.

Lee J. Hartzell, of Ft. Wayne, Ind., for appellee.

Before ALSCHULER, EVANS, and ANDERSON, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Appellee brought this action to recover upon a life insurance policy issued by appellant to her deceased husband. Appellant relied on two defenses: (a) The policy was lapsed long prior to the death of the insured; and (b) no claim for loss was made until six years after the death of the insured.

The policy was issued August 20, 1907. The last premium was paid August 20, 1913. The insured died in May, 1921. In May, 1927, appellee notified appellant of the death of the insured and offered to furnish the necessary proofs. Defendant denied all liability.

The cause was submitted to a jury, and a general verdict was returned in plaintiff's favor. Judgment for the amount of the verdict was thereupon entered, from which judgment this appeal was prosecuted.

The policy provided: "After one full annual payment shall have been made, and before a default in the payment of any subsequent premium, if the insured shall furnish satisfactory proof that he has been wholly disabled by bodily injuries or disease, and will be permanently, continuously and wholly prevented thereby for life, from pursuing any and all gainful occupations, the company, by an indorsement in writing upon this contract, will agree to pay for the insured the premiums, if any, which shall thereafter become payable during the continuance of such disability."

At the close of the trial defendant moved for a directed verdict on the ground that the insured lapsed his policy when he failed to pay the premiums which became due August 20, 1914. Its contention is that the evidence failed to bring the insured within the policy provision which excused him from the further payment of premiums. In view of our conclusion respecting this defense, it will be unnecessary to consider any other assignment of error. The statement of facts will be made accordingly.

On August 20, 1913, insured borrowed $1,180 on this policy to take up a previous loan and to obtain the maximum amount of cash which was obtainable through a loan on this policy. In August of the next year he again applied for such additional loan as he could obtain on this policy and offered to pay the difference between the amount thus obtainable and the premium and old note in cash. The company sent him application blanks, a new note, and a statement of the balance. The insured returned the application and note and inclosed a money order, all of which appellant received September 21st, or 31 days after the date the premium was due and payable. The policy gave insured a 30-day grace period in which to make premium payments, so his remittance was late by one day. The application, however, was not duly witnessed, and the company returned all papers with the request that insured also supply a good health certificate. These papers were returned with a health certificate included. The last-named document told of an accident and a sickness following the accident which caused appellant to demand a physical examination. In due time this examination was made. The company thereupon refused to reinstate the insured. Insured then endeavored in vain to secure a change of policy and a reinstatement on the basis of such new policy. Thereafter no premiums were ever paid, and both parties treated the insurance as terminated.

To avoid the effect of the lapse of this insurance through nonpayment of the 1914 premium, appellee proved, or attempted to prove, that the insured was, from a date preceding August 20, 1914, insane, and was wholly disabled by bodily injury or disease which permanently and continuously and wholly prevented him for the rest of his life

from pursuing any and all gainful occupation.

Appellant insists as to this issue that the evidence was not sufficient to justify its submission to the jury.

In examining the evidence to determine whether a jury question was presented, it is necessary to keep in mind that the policy provision above quoted, which exempted the insured from the further payment of premiums, called for "satisfactory proof" (a) "before the default in the payment of any premium," and (b) that insured was "wholly disabled * * * and will be permanently, continuously and wholly prevented thereby for life from pursuing any and all gainful occupations."

Ignoring for the present the requirement of proof establishing (a) and confining our attention entirely to the requirement of (b), the evidence, instead of disclosing incapacity upon the part of the insured, affirmatively established the contrary.

Two letters, written by insured on August 14 and September 15, 1914, conclusively negative appellee's contention that he was insane when the policy lapsed. We quote therefrom:

"I am very sorry to trouble you, but I will have to ask you for another loan to help me out on this year's premium. I have spent considerable money this year on land; next year, I expect to take up the loan and will be very glad to have you arrange for a loan and let me off with as little as possible this year.

"With this year's loan value and the dividend coupon, there should not be much if any for me to pay, but send on the blanks and I will make up the difference if it is not enough.

"I would like to know if the company is operating in New Mexico, and if so, I would like to make arrangements to write a little business here as a part time man. I live 18 miles east of Deming.

"Yours very truly,
"George F. Keller."

"Enclosed herewith you will find M. O. for $44.40, together with loan agreement signed as per your letter of August 22nd. I am sorry to note that you are not doing business in this state, as lots of business could be written, in this, the membres valley, and would be glad to have you remember me as a part time man when you enter the state. I have bought considerable land in the valley, and expect to remain here indefinitely. Regarding Texas, I wish to ask if you have an agent at El Paso, and if so, would you kindly give me his name and address. I go to El Paso on frequent trips, and may do some business through him. I am,
"Yours very truly,
"George F. Keller."

Plaintiff on September 13th wrote appellee as follows:

"New Haven, Indiana. September 13-13.
"International Life Insurance Company, St. Louis, Missouri. Gentlemen: I am enclosing G. F. Keller's insurance policy as per loan agreement; have sent the note to Mr. Keller to sign, which I will forward to you from Texas.

"Thanking you again for the consideration you have shown me, I am,
"Yours truly,
"Mrs. George F. Keller."

Following the rejection of the reinstatement application, insured wrote appellant as follows:

"International Life Ins. Co., St. Louis, Mo. Gentlemen:—Your letter of 17th inst. advising me that you had declined to reinstate me received. I do not believe this is treating me just right, everything considered. In the first place it was very rare and uncommon for the money order not to have been accepted, as it was issued on the 17th of September and got in St. Louis on the 19th but perhaps too late for delivery. You then asked for a health statement which I gave, and then you followed this up by asking for a physician's certificate which I also gave and went to the Dr. you requested. Now, gentlemen, I realize it is a case of you wanting to dispose of me or my policy and I do not know which it is. I have strong reasons to believe that it is the latter, and I wish to ask if you would be willing to issue me a standard policy, 20 pay or whole life instead of the old one. I was in the life insurance business for 17 years and I know that the old policy was not or is not desirable business for a company to have on their books. I am willing to consider a proposition to exchange policies as I do not want to be without Ins. and would, of course, just as soon have it in the International. I feel that anything you would be willing to do, would be better for me than to have a rejection against me, as the matter now stand it would perhaps make it hard for me to get some insurance.

"Trusting you will give this matter due consideration, I am,
"Yours very truly,
"George F. Keller."

In September, 1914, Keller signed an application for reinstatement, wherein he answered many questions, all of them intelligently, and answered "Yes" to the question, "Are you now of sound constitution and of good health?" Similar answers were made to like questions on November 3, 1914, and the applicant submitted a statement from a physician, who answered "No" to the question, "Do you know of any physical impairment or anything in the habits or morals of the applicant, not given above, that would make him an undesirable risk for insurance?" The physician likewise answered "No" to the question, "Do you find any evidence of disease of the heart or lungs?" It further appears that insured made application for a homestead entry of 160 acres in New Mexico on October 25, 1913. On August 12, 1915, he wrote the Receiver of the Land Office as follows:

"Receiver and Register U. S. Land Office Las Cruces, New Mexico. Gentlemen: This is to notify you that I have left my Homestead Serial No. #08941, for a vacation of a few months, pursuant to the three year Homestead Law.

"Yours very truly,

"Geo. F. Keller."

On March 13, 1916, he wrote the Land Office as follows:

"S. P. Ascorata, Receiver U. S. Land Office Las Cruces, New Mexico. Dear Sir: Regarding application for enlarged homestead No. 013169, I am enclosing herein $1.00 cancellation fee, as per your letter of the 7th inst.

"I was not advised of this fee, or I would have sent it in with the application.

"Yours very truly,

"Geo. F. Keller."

In the same year he made final proof of homestead as follows:

"Name is George F. Keller, was born in the State of Indiana, and is the same person who made Homestead Entry #08941 at the Las Cruces, New Mexico Land Office, October 25th, 1913, for certain lands, and on March 16th, 1916, made an additional Homestead Entry #013169 for other lands. Is married and family consists of wife and self. He first established actual residence on the land December 1st, 1913. He left the land August 1st, 1915 returning to Deming, January 1st, 1916, and was in the hospital at Deming, New Mexico, thirty days. Number of acres cultivated and kind of crops planted were as follows:

"1914—Cultivated 18 acres to melons, good crop.

"1915—Cultivated 20 acres to milo maize, poor harvest, drought.

"1916—Cultivated 40 acres to milo maize, no harvest, drought.

"1917—Cultivated 10 acres to milo maize and beans.

"Character of improvements were—one frame dwelling house of two rooms—well—engine and pump—grainery—twenty acres fenced—10 acres cultivated. Value $1635.00.

"Claimant has made another application to enter 320 acres under the 640 acre Homestead Law, but such application has not been acted upon. Geo. F. Keller."

On March 4, 1918, he made an affidavit containing similar information.

Defendant also offered the testimony of eight or ten disinterested witnesses who lived in New Mexico. They were either neighbors or lived within a few miles of Keller while he was "proving up" the New Mexico homestead. There is no contradiction to their testimony. They all testified that the insured was of sound mind, rational in his speech and conduct. They all testified to his working on the ranch, clearing the land, raising crops, and building fences. During his stay there he not only helped to drill the well on his own homestead, but helped to drill two other wells. He helped to bale considerable Yucca tops. He owned a well-drilling outfit.

He borrowed money from the local bank, and during part of the time conducted a repair shop for automobile radiators. True his borrowing of money might not be proof of physical health or strength but is rather persuasive on the issue of insanity, for a bank would hardly loan money on the unsecured note of one who was insane.

The evidence relied on by appellee consisted of the testimony of various people living in New Haven who saw and visited with insured during 1919–1921. Their statements leave no room for doubt as to his then condition. They pictured a man who had made a losing fight with tuberculosis. Their story awakens our sympathetic impulses, but it is devoid of facts indicating insanity or physical incapacity on Keller's part in August, 1914. It is entirely consistent with the statements of Keller's New Mexico neighbors. These New Mexico neighbors spoke of Keller in 1914. The New Haven neighbors described him five years later when in the last stages of tuberculosis.

Appellee's testimony on direct examina-

tion referred generally to Keller's condition from 1912 to 1921. However, her attention was later specifically directed to the period from 1913 to 1918. She said:

"They (insured and appellee) then came back to New Haven (Indiana) and remained a short time and then went back to the West, but she has no way of telling what month they went back. The ranch was near Myndus (New Mexico), a little town twenty miles from Deming. The ranch was four miles from Myndus. She stayed on the ranch until about November 1914 and then she went to New Haven. Mr. Keller came back to New Haven permanently in 1918 or 19 and did not again go to the ranch. From the time she left Keller in November of 1914 she is absolutely unable to tell how much of her time she spent with him. She can't remember when she went back to New Mexico after November of 1914, but it was in the year 1915. When she went back she found him in El Paso, Texas. She can't remember what he was doing there. She can't tell whether she found him in El Paso in the Spring of 1914 or the Summer or the Fall. She can't state how long she stayed in El Paso with him. She was with Mr. Keller a great deal of the time. She happened to find him in El Paso because he came there and got her and they then went to the ranch. She can't tell how long they stayed there. It was longer than a week, but she can't tell whether it was a month. She can't tell just where she was in the year 1916 or in 1915 or in 1917. She was back and forth. She was sure that she was with him for a month at least. She spent considerable time in El Paso, but can't tell in what year. She was with Mr. Keller a great deal of the time. She is not in position to tell where they were in 1917. They were in New Haven part of the time. She thinks Mr. Keller was in New Haven but can't tell how long. It might have been a month or it might have been six weeks. She spent part of the time in El Paso, but can't tell how long. She doesn't believe he was working in El Paso in 1917. She doesn't remember whether she spent any part of 1918 on the ranch, but thinks he came home to New Haven in the Fall of 1918. He came home alone. She doesn't know that he spent most of his time from 1914 to 1918 on the ranch. He spent part of his time there. Part of the time he was in El Paso and part of the time at Columbus and part of the time at New Haven and part of the time at the ranch. He tried to work in El Paso, but he was unable to hold anything he had. She does not think he was there four or five months. She doesn't remember whether he was in El Paso during the year 1919 from May to October working for the City Water Works of the City of El Paso. She knew he was trying to work there, but she doesn't think it was that long. She knew he was trying to run an engine out there. She was in El Paso part of the time, but can't tell how much of the time. She doesn't know how long he had his own automobile shop in El Paso. It was not for long, but whether it was a week or a month she would have no idea. She went to Columbus after Mr. Keller went there and he was in an office handing out calendars. She does not think that he worked at automobile repair work. It did not impress her that it was for any considerable length of time. She can't tell even approximately how long she was in Columbus with him. She doesn't know the year she was in Columbus with him. She does not know the year she was in Columbus, but thinks that it was while the Pershing Expedition was on. After that she does not have any recollection as to when she next saw him. She and Mr. Keller were together for a considerable length of time from the year 1913 on through 1917 and 1918, but is not in position to tell how long."

Giving the language of the policy, "wholly disabled by bodily injury or disease and will be permanently, continuously, and wholly prevented thereby for life from pursuing any and all gainful occupation," a construction most favorable to the plaintiff, it is still impossible, upon the record before us, to find any evidence which created an issue which required its submission to the jury.

The judgment is reversed, and the cause remanded for a new trial.